Elliot J. Siegel (Bar No. 286798)
elliot@kingsiegel.com
Julian Burns King (Bar No. 298617)
julian@kingsiegel.com
Brent R. Boos (Bar No. 292808)
brent@kingsiegel.com
**KING & SIEGEL LLP**
724 South Spring Street, Suite 201
Los Angeles, California 90014
tel:  (213) 465-4802
fax: (213) 465-4803

Attorneys for Plaintiff and Putative Class

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **Nicholas Race,** individually and on behalf of all similarly situated individuals,<br><br>        Plaintiff,<br><br>    vs.<br><br>**Floyd, Inc.,** a Delaware corporation; and **Does 1-10**, inclusive;<br><br>        Defendants. | CASE NO.<br><br>**CLASS ACTION COMPLAINT FOR:**<br><br>**1) Violation of California's False Advertising Law (Bus. & Prof. Code §§ 17500, et seq.);**<br>**2) Violation of California's Consumer Legal Remedies Act (Cal. Civ. Code §§ 1750, et seq.); and**<br>**3) Violation of California's Unfair Competition Law (Bus. & Prof. Code §§ 17200, et seq.);**<br><br>**<u>Demand for Jury Trial</u>** |

Plaintiff Nicholas Race, by and through his counsel of record, brings this action on behalf of himself and all other similarly situated consumers who purchased qualifying products from Floyd, Inc. and alleges as follows:

## **INTRODUCTION**

1.     Reference pricing is an advertising technique where retailers display a product's current, typically discounted, price next to a higher, regularly offered price for that product. That higher, regularly offered price is known as the "Reference Price."

2.     "[R]eference prices are important cues consumers use when making the decision concerning how much they are willing to pay for the product." *See* Jerry B. Gotlieb & Cyndy Thomas Fitzgerald, *An investigation into the effects of Advertised Reference Prices on the Price Consumers are Willing to Pay for the Product*, J. of Applied Bus. Research 6, no. 1, pp. 65-66 (1990); *see also* Patrick J. Kaufmann, N. Craig Smith, & Gwendolyn K. Ortmeyer, *Deception in Retailer High-Low Pricing: A 'Rule of Reason' Approach*, 70 J. Retailing 115, 118 (1994) ("reference to a retailer's normal or regular price in retail sale prices advertising provides the consumer with information used to determine perceived value").

3.     Empirical research indicates that "[i]nflated reference prices can [...] increase consumers' value perceptions [...], reduce their search intentions for lower prices, increase their purchase intentions, and reduce their purchase intentions for competing products." Dhruv Grewal & Larry D. Compeau, *Pricing and Public Policy: A Research Agenda and an Overview of the Special Issue*, J. Public Policy & Marketing 18, no. 1, p. 7 (1999).

4.     In other words, by advertising discounts off higher reference prices, retailers can increase the perceived value of products to consumers and decrease their desire to search for competing products, making them more likely to buy the retailer's product.

5.     Further, by representing that discounts are temporary, retailers can

CLASS ACTION COMPLAINT

increase a consumer's sense of urgency to buy the product now rather than later or risk losing the discount.

6.    While offering legitimate discounts to achieve these results is a valid form of competition, offering fake ones—with fictitious reference prices and/or expiration dates—is deceptive, illegal, and harmful to consumers.

7.    Indeed, research "suggest[s] that consumers are likely to be misled into a willingness to pay a higher price for a product simply because the product has a higher reference price." *An investigation into the effects of Advertised Reference Prices on the Price Consumers are Willing to Pay for the Product, supra*, at p. 66. One study showed that "on average, consumers were willing to pay $178.60 for the product with a $289 reference price" but "were willing to pay $250.80 for the identical product with a $429.00 reference price." *Id.*

8.    The temptation to advertise fake discounts is significant for retailers, whose profits can be increased by simply claiming that their products, or "similar" products, regularly sell for more than they really do.

9.    To combat such deceptive and unfair practices, California's False Advertising Law ("FAL") prohibits businesses from making statements that they know or should know to be untrue or misleading. Cal. Bus. & Prof. Code § 17500. This includes a prohibition on advertisements stating or suggesting that a product is discounted when, in fact, it is not.

10.    The FAL considers a sale to be fake—and illegal—when it continues for a period of more than 3 months, *i.e.*, a permanent sale. Cal. Bus. & Prof. Code § 17501 ("No price shall be advertised as a former price [. . .] unless the alleged former price was the prevailing market price [. . .] within three months next immediately preceding the publication of the advertisement.").

11.    Similarly, California's Consumer Legal Remedies Act ("CLRA") prohibits "advertising goods or services with the intent not to sell them as advertised" and specifically prohibits, among other things, "false or misleading statements of fact

concerning reasons for, existence of, or amounts of price reductions." Cal. Civ. Code § 1770(a)(9), (13).

12.    Fake or permanent discounts violate these laws. They are anti-consumer, anti-competitive, and must be brought to a halt.

## PARTIES

13.    Plaintiff **Nicholas Race** is and was at all relevant times domiciled in San Mateo, California.

14.    The proposed Class includes both current California residents and former residents who were domiciled in California when they purchased one or more qualifying products from Floyd, Inc. while those products were advertised with false or misleading discounts.

15.    Defendant **Floyd, Inc.** ("Floyd" or "Defendant") is a Delaware corporation with its principal place of business located at: 1948 Division Street, Ste. 101, Detroit, MI 48207. It is a direct-to-consumer manufacturer and retailer of home furnishings.

16.    Plaintiff is not currently aware of the names and true identities of Does 1-10. Plaintiff reserves the right to amend this complaint to allege their true names and capacities when this information becomes available. Each Doe defendant is responsible for the damages alleged pursuant to each of the causes of action asserted, either through its own conduct or vicariously through the conduct of others. All further references in this complaint to any of the named Defendants include the fictitiously named Doe defendants.

17.    At all times alleged herein, each Defendant was an agent, servant, joint employer, employee, partner, and/or joint venture of every other Defendant and acted within the scope of their relationship with the others. Moreover, the conduct of every Defendant was ratified by each other Defendant.

## JURISDICTION AND VENUE

18.    This Court has subject matter jurisdiction under 28 U.S.C. §

1332(d)(2). The amount in controversy exceeds $5,000,000, exclusive of interest and costs, and the matter is a class action in which one or more members of the proposed Class are citizens of a state different from that of Defendant.

19.    This Court has personal jurisdiction over Defendant. Defendant does business in California. It advertises and sells its products in California to a market of consumers there. Due to Defendant's actions, its products have been marketed and sold to consumers in California and have harmed consumers in California. Plaintiff's claims likewise arose out of Defendant's contacts with this forum. Due to Defendant's actions, Plaintiff purchased Defendant's product in California and was harmed in California.

20.    Venue is proper under 28 U.S.C. § 1391(b)(1) and 28 U.S.C. § 1391(d) because Defendant would be subject to personal jurisdiction in this District if this District were a separate state. Defendant advertises and sells its products to consumers in this District, serves a market for its products in this District, and Plaintiff's claims arose out of Defendant's contacts in this forum. Venue is also proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred here.

## **FACTUAL ALLEGATIONS**

### *Floyd Advertises Sales with False and Misleading "Discounts"*

21.    Defendant Floyd, Inc. markets and sells a variety of home furnishings (the "Products") directly to consumers.[1]

22.    The Products are privately branded (i.e., Floyd products) and—with few exceptions—exclusively sold by Defendant.

23.    To that end, Defendant maintains a public website where it advertises

---

[1] Based on infortation and belief, Defendant is also the manufacturer of the Products. However, the meaning of "Products" includes all products sold by Defendant directly to consumers – regardless of whether those products are indeed manufactured by Defendant.

1    its Products for sale. Consumers can purchase the Products through an online store

2    hosted on this website (https://floydhome.com/).

3        24.    Like many businesses, Floyd advertises "discounts" or "sales," during

4    which the prices for its Products are purportedly reduced from higher, regular

5    prices (i.e., "Reference Prices").[2]

6        25.    However, these Reference Prices are fictitious, rendering Floyd's

7    "sales" and advertised "discounts" illusory. Defendant's Products are *always* ad-

8    vertised with discounts off higher Reference Prices, so no consumer *ever actually*

9    *pays* the References Prices from Defendant represents they are discounted.

10        26.    In other words, the "discounted" prices *are* Defendant's regular prices,

11    and its Reference Prices are fictitious ones used solely to induce potential custom-

12    ers into purchasing its Products and paying higher prices for them.

13        27.    This practice is known as false reference pricing. False reference pric-

14    ing occurs when a seller advertises an artificial, inflated price for the sole purpose

15    of enabling the subsequent offer of a large reduction from that price. In such cases,

16    the "reduced" price is, in reality, just the seller's regular price and the "bargain"

17    being advertised is a false one where the purchaser is not receiving the value he or

18    she expects from the purchase.

19        28.    At any given time, on its website, Defendant advertises significant "dis-

20    counts" relative to the Reference Prices it misrepresents its Products to have. De-

21    fendant communicates this in at least five distinct ways:

22        29.    *First*, Defendant continuously advertises sitewide sales on a banner at

23    the top of its website while simply changing the name of the sale to reflect the

24

25

26

27    [2] The meaning of "Reference Prices" also includes Defendant's use of comparison

28    prices, comp prices, comparison values, and/or comp values – verbiage it began
     using on its website on and after June 8, 2024.

1   period during which it is in effect.[3]

2       30.    For example, from July 26-29, 2024, Defendant's sales banner stated:

3   "THIS WEEKEND ONLY: <u>FREE SHIPPING</u> on Sectionals. Save up to 25%

4   sitewide." The next day, on July 30, 2024, it read: "<u>The August Sale</u>: Save up to

5   30% sitewide." The "August Sale" ran until August 15, 2024, and on the next day,

6   it was immediately followed up with: "<u>HAPPENING NOW</u>: Save 30% on Sectionals

7   and up to 20% sitewide." Example screen captures are provided below:



21      31.    Based on information and belief, this practice has resulted in all but a

22  few of Defendant's Products being advertised with discounts at all times through-

23  out the relevant period – the only exceptions being "Free" items, "Serviceability"

24  items, and one other item identified as "Partner Products: Bed + Headboard SKUs"

25  (discussed below).

---

[3] While the advertised discounts may vary by a small percentage, during these
sales, all but a few of Defendant's products remain on sale to one degree or another.

32.    Consistent with this, Defendant's website contains a subpage where all of its Products are advertised (https://floydhome.com/collections/all-1). This subpage lists 163 items for sale (at time of filing). Except for a few items listed as "Free" (such as fabric swatches), items identified with the tag "Serviceability"[4] (which appear to be replacement parts for other Products), and one item identified as "Partner Products: Bed + Headboard SKUs," *all* of Defendant's Products are (at time of filing) advertised as being on sale for a discounted price.

33.    Prior to June 8, 2024, Defendant's sales advertisements unequivocally passed off its discounts as being reductions from the Reference Prices regularly and formerly charged for its Products. During that time, Defendant advertised sales with statements such as:

- "Save 30% on sectionals and 20% on everything else during The Memorial Day Sale! Promo subject to change. Some exclusions apply."
- "Save 30% on sectionals and 20% on everything else during The Spring Sale! Promo subject to change. Some exclusions apply."
- "Save 30% on sectionals and 20% on everything else during The Presidents' Day Sale! Plus, shop warehouse closeouts for up to 60% off. Promo subject to change. Some exclusions apply."
- "The New Year's Sale: Save 30% on sectionals and 20% on everything else, sitewide."

34.    This practice continued beyond June 8, 2024, but since that date, Defendant's sales advertisements have included an asterisk ("*") with an explanation below the advertisement stating: "*Savings off of comp value. Promotion subject to change. Some exclusions apply." However, aside from the addition of this asterisk, Defendant did not change the formatting of its sales advertisements in any material way. Defendant has continued to advertise non-stop sales with sitewide

---

[4] Some but not all "Serviceability" items are advertised with discounts.

discounts while simply changing the names of the sales and sometimes the amounts "discounted." For example, Defendant has advertised the following sales since June 8, 2024:

- "Save 30% on sectionals and 20% on everything else during The Summer Sale! Promo subject to change. Some exclusions apply."

- "Save 25% and free shipping on sectionals. Save 20% on everything else during The Weekend Flash Sale!* Promo subject to change. Some exclusions apply."

- "Save 30% on sectionals and up to 20% on everything else during The Labor Day Sale!*"

- "The Fall Sale is happening now, save up to 30%* sitewide."

- "Shop our Black Friday Preview Sale. Enjoy 40%* off and Free Shipping on Sectionals. Save 20%* on everything else, sitewide."

35.    Further, based on information and belief, none of the Reference Prices used for Defendant's Products changed after June 8, 2024, to reflect "comp values" instead of prices it represented as those regularly and formerly charged for its Products for years prior.

36.    *Second*, Defendant's website is organized into collections (e.g., Living Room, Bedroom, Home Office, etc.), wherein, at least since June 8, 2024, Products belonging to the collection are currently listed for sale with a "Starting at" price displayed alongside a specified percentage "OFF COMP VALUE" (e.g. "40% OFF COMP VALUE", "20% OFF COMP VALUE," etc.). An example screen capture is provided below:



37.    However, prior to June 8, 2024, Defendant simply listed its Products for sale on these collection pages with "Starting at" prices displayed alongside a specified percentage off and no reference to "comp value" (e.g., "30% OFF"). An example screen capture is provided below:



38.    *Third*, on each individual Product's listing page, Defendant currently advertises that Product with the same "Starting at" price displayed next to a specified percentage "OFF COMP VALUE" (e.g., "40% OFF COMP VALUE"). An example screen capture is provided below:



39.    If a customer clicks on a nearby question mark, a pop-up is displayed stating that "Comparable (Comp) Value is based on market value of similar items." An example screen capture is provided below:



40.    However, before June 8, 2024, Defendant's Product listing pages simply listed "Starting at" prices next to an unclickable box displaying a specified percentage off that price (e.g., "25% OFF"). An example screen capture is provided below:

41.    Below the "Starting at" price is a box that can be clicked to add the Product to an online shopping cart. At the time of filing this action, this clickable box also lists the Product's purportedly discounted price next to a struck-out Reference Price followed by "Comp" (e.g., "**Add to cart** ~~$2,945.00 Comp~~ $1,767.00"). See screen capture in ¶ 38 above.

42.    Archived snapshots of Defendant's Product listing pages do not cap-ture these struck-through Reference Prices. Still, upon information and belief, this "**Add to cart**" box also displayed struck-out Reference Prices before June 8, 2024, but without the word "Comp."

43.    *Fourth*, after a customer clicks the "**Add to cart**" box, they are di-rected to their online shopping cart wherein the Product has been placed for pur-chase. For each item in the shopping cart, the purportedly discounted purchase price is listed in bold next to a Reference Price that Defendant identifies as being the Product's "Value" (e.g., "$1,465.00 Value **$879.00**").[5] To the right of this, De-fendant displays a negative dollar amount representing the customer's purported "Savings," which is the summed difference between each sale price and Reference Price for Products in their online shopping cart (e.g., "Savings -$1,874.00"). Below this, the customer's subtotal is listed, and further below that is a clickable "Check-out" box. An example screen capture is provided below:[6]

---

[5] The Wayback Machine's does not contain any archived "snapshots" of shopping carts, so Plaintiff's counsel could not confirm whether pre-June 8, 2024, shopping carts referred to "Value."

[6] Because some of Defendant's Products are modular and configurable, each indi-vidual module is listed as a separate item in this online shopping cart.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17



18   44.   Like the "**Add to cart**" box, archived snapshots of Defendant's website
19   did not capture customers' shopping carts, but based on information and belief,
20   the screen capture in ¶ 43 also accurately depicts what they looked like before June
21   8, 2024.

22   45.   *Fifth*, when a customer clicks the "Checkout" box, they are directed to
23   a checkout page where each Product in their online shopping cart is again listed
24   with its purportedly discounted price below a struck-out Reference Price, as well
25   as a negative dollar amount equal to the difference (or purported savings). At the
26   bottom of this, Defendant calculates and lists the total purported savings (e.g.,

27
28

"TOTAL SAVINGS $1,874.00"). An example screen capture is provided below:



46.    Like shopping charts, archived snapshots of Defendant's website did not capture customers' checkout pages, but based on information and belief, the screen capture in ¶ 45 also accurately depicts what they looked like before June 8, 2024.

47.    The Reference Prices listed and struck out on Defendant's Product

listing pages, identified as the Products' "Value" in customers' shopping carts, and again listed and struck out on checkout pages, could only reasonably be understood by consumers to represent prices regularly and formerly charged for the Products, and that the sale being advertised offered a temporary discount off of those prices.

48.    This is equally true of Defendant's sales advertisements before and after June 8, 2024. Defendant's addition of an asterisk and reference to "comp value" in its sales advertisements, starting on June 8, 2024, did not make those advertisements any less misleading or deceptive because its representations that the sales were limited-time offers were designed to mislead customers into thinking that the pricing would revert back to their advertised Regular Prices after the sale.

49.    Defendant knew and counted on the fact that reasonable consumers interpreted its sales advertisements to mean that it regularly and formerly charged the Reference Prices for its Products, and that they would receive a discount off those prices if they made purchases during the advertised sale.

50.    Defendant also knew and counted on the fact that reasonable consumers would reasonably interpret these advertisements to mean that Defendant would—sometime soon—charge the Reference Prices again for its Products, so if they waited too long to make their purchases, then they would miss out on the advertised "discounts." But, in reality, Defendant's Products have never been sold at their Reference Prices (later called Comp Values), so the discounts were just illusions.

### Plaintiff's Counsel's Investigation

51.    To confirm that Floyd offers perpetual discounts off Reference Prices that its Products were never actually sold at, Plaintiff's counsel investigated its sales advertising history using the Internet Archive's Wayback Machine (available at www.archive.org).[7] That investigation indicated that Defendant's Products had

---

[7] The Internet Archive, available at www.archive.org, is a library that archives web pages. *See* https://archive.org/about/

1    been continuously discounted, sitewide, since at least July 4, 2022.

2        52.    The Internet Archive's Wayback Machine stores archived versions (or

3    "snapshots") of Defendant's website, including subpages, going back to May 8,

4    2018.[8] Since at least July 4, 2022, it has also stored archived snapshots of a sub-

5    page where Defendant advertises its sitewide sales and displays listings for all its

6    Products "on sale," which is located at: https://floydhome.com/collections/sale-

7    promo ("Sale Promo Page").

8        53.    Since that time (and until the time of filing), the Wayback Machine has

9    captured 103 "snapshots" of Defendant's Sale Promo Page from 76 different dates.

10   In 100% of those snapshots, Defendant advertised sitewide sales during which all

11   of its Products appear to have been discounted by a minimum of 15% against their

12   false Reference Prices—although they are frequently discounted by even greater

13   percentages.

14       54.    Thus, for over *two years*, Defendant's Products have *never* actually

15   been sold at their advertised Reference Prices. As a result, customers never actually

16   received the advertised discounts because the discounted prices were just Defend-

17   ant's regular prices.

18       55.    Defendant's individual Product listing pages confirm the same. For ex-

19   ample, the listing page for Defendant's Sink Down Sectional (the same Product

20   that Plaintiff purchased in its three-piece configuration on February 19, 2024) was

21   archived by the Wayback Machine 803 times between May 10, 2023, and August

22   28, 2024. Except for three calendar weeks where no snapshots were archived,

23   Plaintiff's counsel downloaded at least one snapshot per calendar week from the

24   Wayback Machine. In 100% of these snapshots, Defendant's Sink Down Sectional

25   was advertised as being discounted by 20% or more.

26   ───────────────

27   [8] The Wayback Machine has archived snapshots of https://floydhome.com/ going
     back further than May 8, 2018, however, those websites do not appear to be asso-
28   ciated with Floyd, Inc.

56.    Based on information and belief, Defendant's Sink Down Sectional was first introduced to the market on or about May 10, 2023. Because it has only ever been sold by Defendant, it has *never* been sold at its advertised Reference Price to *anyone*, *anywhere*, at *any time*.

### Floyd's Reference Prices Are Not Prevailing Prices or Comp Values

57.    Floyd is the manufacturer of the Products, and the vast majority of its Products are sold directly to consumers (at purportedly discounted prices) through its website.

58.    Based on Plaintiff's counsel's investigation, the only other seller of Defendant's Products is Haworth, Inc., which sells through its website at: https://store.haworth.com/collections/floyd. However, their selection of Floyd Products is extremely limited, including only the Floyd Shelving System, and two-piece, three-piece, four-piece, and five-piece versions of its Form Sectional. In contrast, Defendant's All Products collection page lists 163 Products for sale – all of which are always *on* "sale," except for the aforementioned "Free" items, "Serviceability" items, and one other item identified as "Partner Products: Bed + Headboard SKUs."

59.    As the manufacturer and exclusive seller of nearly all its Products, Defendant sets the prevailing market prices for those Products, i.e., because of their exclusivity, the *actual* prices it charges for the Products constitute their market prices.[9] But since Defendant has never sold these Products at their Reference Prices, those prices have necessarily never been their bona fide former or

---

[9] *See People v. Superior Court (J.C. Penney Corp., Inc.)*, 34 Cal.App.5th 376, 409 (2019), as modified on denial of reh'g (May 6, 2019) ("under section 17501, when a retailer sells in-house goods, the retailer's actual prices regarding those goods constitute their market prices"); *see also Spann v. J.C. Penney Corp.*, 307 F.R.D. 508, 527 (C.D. Cal. 2015), modified (C.D. Cal. 2016) 314 F.R.D. 312 (where defendant sold "private and exclusive branded items," it was appropriate to apply defendant's "own prices as the measure of prevailing market prices").

CLASS ACTION COMPLAINT

prevailing market prices.

60.    To the extent that any of the Products are sold by third-party resellers, their prices are not the *prevailing* market prices because only a small fraction of the Products are sold by them.

61.    Because *the* Products are *always* discounted from Reference Prices, and because Defendant's actual prices *are* the market prices, the advertised Reference Prices were *never* the prevailing market prices during the requisite three-month period under the FAL.

62.    Further, prior to June 8, 2024, Defendant unequivocally represented its Reference Prices to be regular and former prices for its Products. When Defendant instead began referring to Reference Prices on its website as "comp values," none of those Reference Prices were changed to reflect the market value of similar items – they continued to reflect the same Reference Prices that Defendant had advertised on its website for years prior.

63.    In reality, Defendant's advertised Reference Prices do not actually refer to the "comp values" of any similar items. Defendant simply included references to "comp values" on its website in a misguided attempt to avoid lawsuits such as this one. Indeed, in an email sent from Defendant to Plaintiff on June 18, 2024, discussing Plaintiff's order of the Sink Down Sectional, Defendant referred to the discount received by Plaintiff as a discount *off the MSRP*, stating: "the total value of your credits and discounts to date [is] 50% of the MSRP."

64.    Further, as previously mentioned, Defendant still refers to its Products' prices as MSRPs on its FAQ page.

### *Floyd's Advertisements Violate California Law*

65.    California's False Advertising Law ("FAL") prohibits any business from making statements concerning its products or services that it knows or should know to be untrue or misleading. *See* Cal. Bus. & Prof. Code § 17500. This prohibition includes false or misleading statements suggesting that a product is

1   discounted from a bona fide former price when, in reality, the former price is a

2   fictitious one. *See e.g.*, Cal. Bus. & Prof. Code § 17501 ("No price shall be advertised

3   as a former price of any advertised thing, unless the alleged former price was the

4   prevailing market price [. . .] within three months.").

5       66.   Further, California's Consumer Legal Remedies Act ("CLRA") prohib-

6   its "advertising goods or services with the intent not to sell them as advertised"

7   while specifically prohibiting "false or misleading statements of fact concerning

8   reasons for, existence of, or amounts of price reductions." Cal. Civ. Code §

9   1770(a)(9), (13).

10      67.   California's Unfair Competition Law ("UCL") generally outlaws "un-

11  fair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

12      68.   Moreover, the Federal Trade Commission's regulations on pricing con-

13  firm that Defendant's scheme is unfair and deceptive. Their regulations prohibit

14  false or misleading "former price comparisons," for example, making up "an arti-

15  ficial, inflated price … for the purpose of enabling the subsequent offer of a large

16  reduction" off that price. 16 C.F.R. § 233.1. They also prohibit false or misleading

17  "retail price comparisons" that falsely suggest that the seller is "offer[ing] goods at

18  prices lower than those being charged by others for the same merchandise" when

19  this is not the case. 16 C.F.R. § 233.1.

20      69.   As detailed above, Defendant made false and misleading statements

21  about its Reference Prices. Specifically, Defendant has continuously advertised its

22  Products as being sold at discounts from Reference Prices masquerading as regular

23  and former prices. However, these Reference Prices were never the prevailing mar-

24  ket prices for Defendant's Products at any time during the three months preceding

25  publication of each advertisement. Thus, they have never been bona fide former or

26  prevailing market prices.

27      70.   Even after Defendant began referring to Reference Prices on its web-

28  sites as "comp values," those prices were still portrayed as representing regular and

former prices because they were advertised under the banners of what could only be reasonably understood as irregular sales offering limited-time discounts. In each case, these sale advertisements clearly described a limited period (e.g., Summer, Weekend, Fall, Black Friday, etc.) during which Defendant offered to sell its Products at purportedly reduced prices.

71.    Further, each advertisement after June 8, 2024, continued to state explicitly, "[p]romotion subject to change," giving further credence to the reasonable beliefs of consumers that Defendant's Products were only temporarily discounted from prices it regularly charged before the sale—and would charge again after the sale—regardless of whether those References Prices were MSRPs or "comp values."

72.    Defendant's addition of an asterisk and reference to "comp value" in its sales advertisements did not make those advertisements any less misleading or deceptive, because implicit in its representations was the conclusion that the sale prices for its Products would revert back to their Reference Prices after the sale.

73.    Thus, Defendant's post-June 8, 2024, advertisements could still be read by reasonable consumers to indicate that Defendant formerly sold the Products at their advertised Reference Prices. *See Inga v. Bellacor.com, Inc.*, No. 219CV10406MWFMRW 2020 WL 5769080, at *3 (C.D. Cal., July 17, 2020) ("Notably, the presence of both 'Compare' and 'Regular' reference prices, in addition to a 'Sales Price,' could be read to suggest that Defendant formerly sold items at the 'Regular' price.").

74.    Defendant knew and counted on these reasonable beliefs of customers to induce them into purchasing Products they would not have otherwise purchased and/or pay higher prices than they would have otherwise paid for the Products.

75.    In short, Defendant has continuously advertised its Products with the intent not to sell them as advertised; for example, by advertising goods as possessing bona fide former prices and/or market values with the intent to sell goods that ever actually commanded those former prices and/or market values.

76.    Further, Defendant's false reference pricing scheme is patently unfair and deceptive. As described above, Defendant advertises fake discounts to false Reference Prices, which induces consumers to purchase the Products and causes them to pay higher prices for them, resulting in substantial economic injury to its customers. But, as explained above, the Products were never actually sold at their purported Reference Prices, so the advertised discounts are illusory.

77.    Reasonable consumers who rely on Defendant to provide accurate and truthful representations about their prices cannot reasonably avoid this injury. Defendant's false discounts offer no countervailing benefits to the public. Misrepresenting the Products' prices solely benefits Defendants while harming consumers and honest competitors alike.

78.    As such, Defendant's business practices are unfair, deceptive, false, and misleading, in violation of California's laws.

### Floyd's False Reference Pricing Scheme Harm Consumers

79.    Empirical research indicates that "[i]nflated reference prices can […] increase consumers' value perceptions (transaction value and acquisition value), reduce their search intentions for lower prices, increase their purchase intentions, and reduce their purchase intentions for competing products." Dhruv Grewal & Larry D. Compeau, *Pricing and Public Policy: A Research Agenda and an Overview of the Special Issue*, J. Public Policy & Marketing 18, no. 1, p. 7 (1999). These retailer-positive outcomes result from several distinct types of inferences consumers make about advertised reference prices. *See* Patrick J. Kaufmann, N. Craig Smith, & Gwendolyn K. Ortmeyer, *Deception in Retailer High-Low Pricing: A 'Rule of Reason' Approach*, 70 J. Retailing 115, 118-22 (1994).

80.    *First*, consumers infer that "the 'regular' price reflects the product's intrinsic value, and therefore is a fair price for the product." *Id.*, at p. 119. "If the consumer wished to purchase a product of the quality indicated by the retailer's regular price, he or she might be induced to take advantage of the advertised

savings to do so." *Id.*

81.    *Second*, consumers infer that "the retailer's 'regular' price reflects the prevailing competitive price and therefore is the market price of the product." *Id.* "Under the second inference, consumers may believe that rational retailers, aware of market conditions, set and adjust their regular prices so as to be competitive in that market." *Id.*, at pp. 118-19. "The direct effect of this inference is to limit active consumer search for competitor price information." *Id.*, at p. 119.

82.    *Third*, consumers infer that "the 'regular' price becomes the penalty price paid only by those unable to wait even the short time for the retailer's frequent sales events." *Id.*, at p. 122. In other words, this inference creates a sense of urgency among consumers to buy now.

83.    In a study measuring the effects of false reference pricing on consumers' purchasing behavior, "[p]articipants were more likely to purchase an item when the selling price appeared discounted" from made-up original prices. Jennie Huang, *The Trill of the Deal: Quantifying the Price of Perceived Discounts and Mark-ups*, manuscript, p. 11 (2018). "Moreover, the larger the perceived discount, the higher the purchasing rate." *Id.*

84.    It was observed that a perceived discount of 10% led to a 3.8 percentage point increase in the purchasing rate, while a perceived discount of 20% led to a 6% increase, and a perceived discount of 40% led to a 10.7 percentage point increase. *Id.*, pp. 11 & 38, Table A1.

85.    Using these tactics, Defendant leads reasonable consumers to believe that its struck-out Reference Prices are its regular prices (i.e., prices at which its Products were recently offered for sale before the advertised "discounts" went into effect). In other words, reasonable consumers reasonably believe that Defendant's Reference Prices represent amounts that consumers normally must pay for Defendant's Products, did pay before its current "sale" began, and will pay again after that "sale" ends.

86.    Reasonable consumers also reasonably believe that Defendant's advertised Reference Prices represent the prevailing market prices and true market values of its Products.

87.    Thus, reasonable consumers reasonably conclude that by purchasing Products during an advertised sale, they are receiving—at the advertised discount—Products with prevailing market prices and true market values equal to the advertised Reference Prices. For example, for a Product purportedly marked down to $2,811.00 from $4,685.00, reasonable consumers would expect that they are receiving a $1,874.00 discount off a bona fide former price, and that the Product has a true market value that is $1,874.00 greater than what they are spending.

88.    Reasonable consumers then *buy* Defendant's products expecting to receive the benefit of their bargain—a discount in the *full* amount being advertised—which they reasonably fear they could lose access at any given moment.

89.    However, Plaintiff's and Class Members' reasonable expectations have *not* been met. Instead of receiving Products with market values equal to advertised Reference Prices, they received items worth less. Instead of receiving significant discounts, Plaintiff and Class Members received little or no discounts.

90.    Thus, Defendant's illegal advertisements harm consumers by depriving them of the reasonable expectations to which they are entitled.

91.    Defendant is incentivized to engage in this illegal conduct because consumers who are presented with discounts are substantially more likely to make purchases: "[n]early two-thirds of consumers surveyed admitted that a promotion or a coupon often closes the deal, if they are wavering or are undecided on making a purchase,"[10] while, "two-thirds of consumers have made a purchase they weren't originally planning to make solely based on finding a coupon or discount," and "80% [of consumers] said they feel encouraged to make a first-time purchase with

---

[10]  https://www.invespcro.com/blog/how-discounts-affect-online-consumer-buying-behavior/

1   a brand that is new to them if they found an offer or discount."[11]

2   92.    Similarly, when consumers believe that an offer is expiring soon, a

3   sense of urgency makes them more likely to buy a product and less likely to com-

4   parison shop or make purchases from other retailers.[12]

5   93.    Thus, Defendant's advertisements harm consumers by inducing them,

6   based on false or misleading information, to make purchases they would not have

7   otherwise made.

8   94.    Further, research "suggest[s] that consumers are likely to be misled

9   into a willingness to pay a higher price for a product simply because the product

10  has a higher reference price." *An investigation into the effects of Advertised Ref-*

11  *erence Prices on the Price Consumers are Willing to Pay for the Product*, *supra*,

12  at p. 66. One study showed that "on average, consumers were willing to pay

13  $178.60 for the product with a $289 reference price" but "were willing to pay

14  $250.80 for the identical product with a $429.00 reference price." *Id.*

15  95.    Thus, Defendant's false and misleading advertisements artificially in-

16  crease consumer demand for its Products, creating upward pressure on the prices

17  that can be charged for its Products. As a result, consumers pay higher prices for

18  the Products than they would absent the misrepresentations described above.

19  ### *Plaintiff Was Misled by Floyd's Advertisements*

20  96.    On February 19, 2024, Plaintiff Nicholas Race purchased a Sink Down

21  Sectional in the three-piece configuration from Defendant's website. He made this

22  purchase while living in San Mateo, California.

23

24  [11] RetailMeNot Survey: Deals and Promotional Offers Drive Incremental Purchases
Online, Especially Among Millennial Buyers (prnewswire.com)

25  [12] https://cxl.com/blog/creating-urgency/ (addition of a countdown timer in-

26  creased conversion rates from 3.4%-10%); Dynamic email content leads to 400%
increase in conversions for Black Friday email | Adestra (uplandsoftware.com)

27  (400% higher conversation rate for ad with countdown timer); *see also* Dhruv
Grewal & Larry D. Compeau, Pricing and Public Policy: A Research Agenda and an

28  Overview of the Special Issue, J. Public Policy & Marketing 18, no. 1, p. 7 (1999).

97.    Plaintiff recalls that after placing this Product in his online shopping cart, before deciding to purchase it, his shopping cart displayed each component of the Product's purportedly discounted purchase price in bold next to a Reference Price that was identified as being the Product's "Value." Plaintiff also recalls that his checkout page listed purportedly discounted prices below struck-out Reference Prices, with a negative dollar amount equal to the difference (or purported savings).

98.    An order confirmation email from Defendant to Mr. Race shows that he ordered three purportedly discounted Products: (1) Sink Down Middle with a listed Reference Price of $1,465.00 and sale price of $1,025.50; (2) Sink Down Left End with a Reference Price of $1,610.00 and sale price of $1,127.00; and (3) Sink Down Right End with a Reference Price of $1,610.00 and sale price of $1,127.00. The subtotal for this order was $3,279.50, whereas the total of Reference Prices equaled $4,685.00.

99.    Consistent with this, the version of Defendant's listing page for this Product archived by the Wayback Machine on February 19, 2024, shows that the Sink Down Sectional was advertised as being "30% OFF" when Mr. Race made this purchase. Further, the sales banner at the top of Defendant's webpage stated: "Save up to 30% off with the Presidents' Day Sale + shop warehouse closeouts up to 60% off!" Nowhere, at that time, did Defendant's webpage refer to "comparison" or "comp" values.

100.    Mr. Race read and relied on these representations from Defendant's website, including in his online shopping cart and checkout page, and order confirmation email, that the Products were on sale and being sold to him at a discount from their regular prices (i.e., Reference Price). Mr. Race understood this to mean that Defendant used to charge the Products' Reference Prices before the sale began and would charge them again after the sale ended.

101.    Thus, Mr. Race reasonably believed that he was receiving a substantial

discount off the regular prices charged for the Products, was receiving products with substantially higher market values than the prices he paid for them, and would miss out on the benefit of this "bargain" if he did not purchase the Products during the advertised sale.

102.    Mr. Race would not have purchased the Products but for these reasonable beliefs based on Defendant's representations described above. Mr. Race only purchased the Products because he believed they were discounted from bona fide former prices, in the full amounts being advertised, and that he would receive Products with higher market values equal to their advertised Reference Prices in exchange for purchasing them before the advertised sale ended.

103.    However, Defendant's representations were false. The Products were never sold at their advertised Reference Prices—neither before nor after the advertised sale—so the discounts advertised by Defendant were illusory and Mr. Race did not receive the benefit of his bargain.

### *No Adequate Remedy at Law*

104.    Legal remedies are inadequate because they would not prevent Defendant from continuing to engage in the unfair and deceptive advertising practices described above. Plaintiff would consider purchasing Products from Defendant again in the future if he could reasonably believe that their advertised Reference Prices and discounts were truthful.

105.    Thus, without an injunction, Plaintiff and Class Members have no realistic way of knowing which—if any—of Defendant's Reference Prices, purported discounts, and supposedly time-limited sales are not false or deceptive. Accordingly, Plaintiff and Class Members are unable to rely on Defendant's advertising in the future, and so cannot purchase the Products they would otherwise consider purchasing from Defendant in the future. Thus, Plaintiff and Class Members face an imminent threat of future harm without an injunction.

### CLASS ACTION ALLEGATIONS

106.   Plaintiff brings this action on behalf of himself and as a class action on behalf of members of the following defined Class:

- All persons who, while in the state of California and within the applicable statute of limitations period, purchased from Defendant's website one or more Products advertised with a discounted price on Defendant's website.

107.   **Numerosity and Ascertainability.** The proposed Class contains members so numerous that a separate joinder of each member of the class is impractical. There are thousands or perhaps even tens of thousands of class members, each of whom can be identified through Defendant's sales records and/or public notice.

108.   **Existence and Predominance of Common Issues.** Common questions of law and fact exist as to all Class Members, which predominate over issues affecting individual Class Members, including, but not limited to:

a.     Whether Defendant falsely advertised Reference Prices for its Products as being former prices for those Products;

b.     Whether Defendant falsely advertised Reference Prices for its Products as being prevailing market prices for those Products;

c.     Whether Defendant falsely advertised References Prices for its Products as being prevailing market prices for similar products;

d.     Whether the purported discounts advertised by Defendant reflected any actual discounts or savings off bona fide Reference Prices;

e.     Whether Defendant made any other false or misleading statements of fact in its advertisements;

f.     Whether Plaintiff and Class Members reasonably relied on Defendant's false or misleading advertisements when purchasing its Products;

g.     Whether Defendant's conduct constitutes violations of California's False Advertising Law, Consumer Legal Remedies Act, and/or Unfair Competition Law;

1    h.    Whether Defendant's conduct constitutes violation any other federal

2    and/or California pricing regulations; and

3    i.    Whether Plaintiff and Class Members sustained damages as a result of

4    any of the aforementioned violations, and, if so, the proper measure of their dam-

5    ages, including interest, penalties, costs, attorneys' fees, and equitable relief.

6    109.  **Typicality.** Plaintiff's claims are typical of the proposed Class. Plain-

7    tiff, like all other Class Members, purchased one or more qualifying Products from

8    Defendant while advertised on its website as being discounted from Reference

9    Prices that were not bona fide former prices or prevailing market prices for the

10    Products.

11    110.  **Adequacy.** There are no material conflicts of interest between Plain-

12    tiff and the proposed Class that would make class certification inappropriate.

13    Plaintiff will fairly and adequately protect the interests of the proposed Class, and

14    he understands his obligation to inform the Court of any relationships, conflicts,

15    or differences with any Class Member(s). Moreover, Plaintiff has retained compe-

16    tent attorneys as proposed class counsel, who are well-versed in the rules govern-

17    ing class action discovery, certification, and settlement, and who will vigorously

18    assert the claims of all Class Members.

19    111.  **Superiority.** A class action is superior to all other available means for

20    the fair and efficient adjudication of this dispute. The damages incurred by indi-

21    vidual Class Members, while significant, are small in comparison to the burden

22    and expense of individualized litigation over Defendant's conduct. Further, the

23    court system would be overwhelmed by individual lawsuits if all Class Members

24    separately sought redress. Such individualized litigation increases the delay and

25    expense to all parties, and to the court system, due to the complex legal and factual

26    issues of this case.

27    112.  Individualized litigation also creates the potential for inconsistent or

28    contradictory judgments. By contrast, the class action device presents far fewer

1  management difficulties; it allows the hearing of claims that might otherwise go

2  unaddressed because of the relative expense of bringing individual lawsuits, and

3  provides the benefits of single adjudication, economies of scale, and comprehen-

4  sive supervision by a single court.

5       113.   Plaintiff contemplates providing individual notice to all members of

6  the Class defined above as identified through Defendant's records.

### CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**Violation of California's False Advertising Law**

***Bus. & Prof. Code §§ 17500, et seq.***

**(On Behalf of Plaintiff and the Class)**

12      114.   Plaintiff repeats and incorporates by reference all allegations con-

13  tained in the preceding paragraphs as if fully set forth herein.

14      115.   Plaintiff brings this cause of action on behalf of himself and all mem-

15  bers of the Class.

16      116.   Bus. & Prof. Code § 17500 provides that "[i]t is unlawful [. . .] with in-

17  tent directly or indirectly to dispose of real or personal property [. . .] to make or

18  disseminate [. . .] any advertising device [. . .] which is untrue or misleading, and

19  which is known, or which by the exercise of reasonable care should be known, to

20  be untrue or misleading, or [. . .] with the intent not to sell that personal property

21  [. . .] so advertised at the price stated therein, or as so advertised."

22      117.   Bus. & Prof. Code § 17501 further provides: "No price shall be adver-

23  tised as a former price of any advertised thing, *unless the alleged former price was*

24  *the prevailing market price as above defined within three months next immedi-*

25  *ately preceding* the publication of the advertisement or unless the date when the

26  alleged former price did prevail is clearly, exactly and conspicuously stated in the

27  advertisement." (emphasis added).

28      118.   As alleged more fully above, Defendant continuously advertises

sitewide sales on its website during which its Products are all advertised as being discounted from purported former prices ("Reference Prices"). Because these sales are continuous and sitewide, *all* of Defendant's Products are *always* discounted.

119.   In addition to sales banners, Defendant advertises Product on its website with Reference Prices, specified percentage offs, and purportedly discounted prices, sometimes also striking out the Reference Prices. These representations are also made in customers' shopping carts and during the checkout process, where Defendant further calculates and displays customers' purported savings.

120.   After June 8, 2024, Defendant added an asterisk ("*") to its advertisements with an explanation that savings were "off of comp value," and included "COMP" wherever it specified the percentage discount for a Product (e.g., "30% OFF COMP" instead of "30% OFF"). However, in all other ways Defendant's sales advertisements continued to be portrayed as discounts to former or regular prices. They still clearly described what could only be reasonably understood by consumers as limited-time sales during which limited time discounts were offered.

121.   Plaintiff and Class Members reasonably understood these advertisements to represent discounts from former or prevailing market prices for the Products, which customers paid before the sale began would pay again after the sale ended.

122.   However, unbeknownst to Plaintiff and the Class, the Reference Prices advertised by Defendant as former prices were never the prevailing prices for its Products. Nor do Defendant's advertisements indicate whether or when the purported former prices were ever actually offered because, in reality, the Products have never been sold for their advertised Reference Prices—only at discounted prices.

123.   Defendant's representations about the regular or former prices of its Products were and continue to be untrue and misleading.

124.   This practice of advertising Products at continuously discounted prices

along with Reference Prices passed off as regular and former prices, which are materially greater than actual prevailing market prices for the Products, constitutes an untrue and misleading advertising practice in violation of California's False Advertising Law.

125.    As a result, Defendant violated, and continues to violate, Sections 17500 and 17501. As a result of Defendant's misrepresentations, Plaintiff and Class Members have been induced to purchase Products they would not have otherwise purchased and/or pay higher prices than they would have otherwise paid for the Products.

126.    Defendant's misrepresentations were intended to induce reliance, and Plaintiff saw, read, and reasonably did rely on them when purchasing Defendant's Products. Defendant's misrepresentations were a substantial factor in Plaintiff's decision to purchase the Products.

127.    In addition, Class-wide reliance can be inferred because Defendant's misrepresentations were material, i.e., a reasonable consumer would consider them important in deciding whether to buy the Products.

128.    Plaintiff and Class Members were injured as a direct and proximate result of Defendant's conduct because (a) they would not have purchased the Products if they had known the truth, (b) they overpaid for the Products because the Products were sold at a price premium due to the misrepresentation, and/or (c) they did not receive the discounts they were promised, and instead received Products with market values substantially lower than the promised market values.

129.    Defendant's acts or omissions are further injurious to the public interest because these practices were committed in the course of its business and have been committed repeatedly, both before and after Plaintiff purchased the Products. They are part of a pattern of false, misleading, and unfair advertising practices. These actions have injured other persons and, if continued, have the capacity to injure yet more persons.

130.   Plaintiff, on behalf of himself and members of the proposed Class, requests that this Court order Defendant to restore money to Plaintiff and Class Members, and to enjoin Defendant from continuing these false and misleading practices in violation of the FAL. Otherwise, Plaintiff, Class Members, and the broader general public will be irreparably harmed and/or denied an effective and complete remedy.

**SECOND CAUSE OF ACTION**

**Violation of California's Consumer Legal Remedies Act**

**Cal. Civ. Code §§ 1750, et seq.**

**(On Behalf of Plaintiff and the Class)**

131.   Plaintiff repeats and incorporates by reference all allegations contained in the preceding paragraphs as if fully set forth herein.

132.   Plaintiff brings this cause of action on behalf of himself and all members of the Class.

133.   Plaintiff and Class Members are "consumers" as that term is defined by Cal. Civ. Code § 1761(d). "'Consumer' means an individual who seeks or acquires, by purchase or lease, any goods or services for personal, family, or household purposes." *Id.*

134.   Plaintiff and Class Members have engaged in "transactions" with Defendant as that term is defined by Cal. Civil Code § 1761(e). "'Transaction' means an agreement between a consumer and another person, whether or not the agreement is a contract enforceable by action, and includes the making of, and the performance pursuant to, that agreement." *Id.*

135.   Plaintiff and Class Members purchased "goods" from Defendant as that term is defined by Cal. Civil Code § 1761(a). "'Goods' means tangible chattels bought or leased for use primarily for personal, family, or household purposes [. . .]" *Id.*

136.   Defendant violated, and continues to violate, numerous provisions of

Section 1770(a) of the California Civil Code.

137.  Defendant violated, and continues to violate, Section 1770(a)(5) of the California Civil Code by representing that Products offered for sale on its website have characteristics or benefits that they do not have. Specifically, Defendant represents that the value of its Products is greater than in reality by advertising inflated Reference Prices for the sole purpose of enabling subsequent offers of large reductions from those prices.

138.  Defendant violated, and continues to violate, Section 1770(a)(9) of the California Civil Code by advertising its Products as being offered at a discount, when in fact Defendant does not intend to sell the Products at a discount.

139.  Finally, Defendant violated, and continues to violate, section 1770(a)(13) by making false or misleading statements of fact concerning reasons for, existence of, or amounts of, price reductions on its website, including by (1) misrepresenting the regular price of Products on its website, (2) advertising discounts and savings that are exaggerated or nonexistent, and/or (3) misrepresenting that the discounts and savings are unusually large, when in fact they are regularly available.

140.  Defendant's misrepresentations were likely to deceive, and did deceive, Plaintiff and other reasonable consumers who are members of the proposed Class. Defendant knew or should have known, through the exercise of reasonable care, that these statements were untrue and misleading.

141.  Defendant's misrepresentations were intended to induce reliance, and Plaintiff saw, read, and reasonably did rely on them when purchasing Defendant's Products. Defendant's misrepresentations were a substantial factor in Plaintiff's decision to purchase the Products.

142.  In addition, Class-wide reliance can be inferred because Defendant's misrepresentations were material, i.e., a reasonable consumer would consider them important in deciding whether to buy the Products.

143.    Plaintiff and Class Members were injured as a direct and proximate result of Defendant's conduct because (a) they would not have purchased the Products if they had known the truth, (b) they overpaid for the Products because the Products were sold at a price premium due to the misrepresentation, and/or (c) they did not receive the discounts they were promised, and instead received Products with market values lower than the promised market values.

144.    Defendant's acts or omissions are further injurious to the public interest because these practices were committed in the course of its business and have been committed repeatedly, both before and after Plaintiff purchased the Products. They are part of a pattern of false, misleading, and unfair advertising practices. These actions have injured other persons and, if continued, have the capacity to injure yet more persons.

145.    Plaintiff seeks damages and, alternatively, restitution. Plaintiff is permitted to seek equitable remedies in the alternative because he has no adequate remedy at law. A legal remedy is not adequate if it is less certain than an equitable remedy. The elements of Plaintiff's equitable claims are different than and do not require the same showings as Plaintiff's legal claims. For example, to obtain damages under the CLRA, a plaintiff must show that they complied with the CLRA's notice requirement to obtain damages. No such requirements exist to obtain restitution. Because a plaintiff must make this additional showing to obtain damages, unlike for restitution, the legal remedies are more uncertain.

146.    Plaintiff also seeks an injunction. Legal remedies are inadequate because they would not prevent Defendant from continuing to engage in the unfair and deceptive practices described above. Plaintiff and Class Members face an imminent threat of future harm. Plaintiff would consider purchasing Products from Defendant again in the future if he could reasonably believe that Defendant's Reference Prices accurately reflect its regular and former prices, and that the market value of its Products and discounts were truthful. Without an injunction, Plaintiff

and Class Members have no realistic way to know which—if any—of Defendant's Reference Prices, discounts, and sales are not false or deceptive. Accordingly, Plaintiff and Class Members are unable to rely on Defendant's advertising in the future, and so cannot purchase the Products they would otherwise consider purchasing from Defendant in the future.

147.   Finally, the remedies at law available to Plaintiff and Class Members are not equally prompt or otherwise efficient. The need to schedule a jury trial may result in delay, and a jury trial would take longer and be more costly than a bench trial.

148.   Accordingly, pursuant to California Civil Code § 1780(a)(2), Plaintiff, on behalf of himself and all other members of the Class, seeks injunctive relief.

149.   CLRA § 1782 NOTICE. On November 21, 2024, a CLRA demand letter was sent to Defendant's Detroit headquarters via certified mail (return receipt requested), which provided notice of Defendant's violations of the CLRA and demanded that Defendant correct the unlawful, unfair, false, and/or deceptive practices complained of herein. Defendant does not have a principal place of business in California. Nor does it have a registered corporate agent in California. If Defendant does not fully correct, or agree to fully correct, the problems alleged by Plaintiff and for each member of the proposed Class within 30 days of receipt, then Plaintiff will seek all monetary relief allowed under the CLRA, including actual, punitive, and statutory damages, as appropriate.

150.   A declaration of venue pursuant to Cal. Civ. Code § 1780(d) is filed concurrently with the filing of this complaint.

### THIRD CAUSE OF ACTION

### Violation of California's Unfair Competition Law

### *Bus. & Prof. Code §§ 17200, et seq.)*

### (On Behalf of Plaintiff and the Class)

151.   Plaintiff   repeats   and   incorporates   by   reference   all   allegations

1  contained in the preceding paragraphs as if fully set forth herein.

2  152.   Plaintiff brings this cause of action on behalf of himself and all mem-

3  bers of the Class.

4  153.   Defendant has violated California's Unfair Competition Law (UCL) by

5  engaging in unlawful, fraudulent, and unfair conduct (i.e., violating each of the

6  three prongs of the UCL).

7  ### The "Unlawful" Prong

8  154.   Defendant engaged in unlawful conduct by violating the FAL and

9  CLRA, as alleged above and incorporated herein. In addition, Defendant engaged

10  in unlawful conduct by violating the FTCA. The FTCA prohibits "unfair or decep-

11  tive acts or practices in or affecting commerce" and prohibits the dissemination of

12  false advertisements. 15 U.S.C. § 45(a)(1), 15 U.S.C. § 52(a). As the FTC's regula-

13  tions make clear, Defendant's false referencing pricing scheme violates the FTCA.

14  16 C.F.R. § 233.1, § 233.2.

15  ### The "Deceptive" or "Fraudulent" Prong

16  155.   As alleged in detail above, Defendant's representations that its Prod-

17  ucts were discounted, that its Reference Prices represented former or prevailing

18  market prices for the Products, or for those of similar products, that customers

19  were receiving true discounts in the amounts advertised, and that customers were

20  receiving goods with market values equivalent to the Reference Prices were false

21  and misleading.

22  156.   Defendant's representations were likely to deceive, and did deceive,

23  Plaintiff and other reasonable consumers who are members of the proposed Class.

24  Defendant knew or should have known, through the exercise of reasonable care,

25  that these statements were untrue and misleading.

26  ### The "Unfair" Prong

27  157.   As alleged in detail above, Defendant committed "unfair" acts by falsely

28  advertising that its Products were discounted, that its Reference Prices represented

CLASS ACTION COMPLAINT

former or prevailing market prices for the Products, or for those of similar products, that customers were receiving true discounts in the amounts advertised, and that customers were receiving goods with market values equivalent to the Reference Prices, when none of this was true.

158.   Defendant violated established public policy by violating the CLRA, the FAL, and the FTCA, as alleged above and incorporated here. The unfairness of this practice is tethered to a legislatively declared policy (that of the CLRA and FAL).

159.   These unfair acts caused Plaintiff and members of the proposed Class to make purchases they otherwise would not have made, pay more for their purchases, and/or be deprived of their expectancy interest in receiving the Products as advertised.

160.   The harm to Plaintiff and members of the proposed Class greatly outweighs any public utility of Defendant's conduct. Their injuries were not outweighed by any countervailing benefits to consumers or competition, as there is no public utility to misrepresenting the prices of Products to consumers. There were reasonably available alternatives to further Defendant's legitimate business interests other than the misleading and deceptive conduct described herein.

### *The Class Was Harmed*

161.   For each prong, Defendant's misrepresentations were intended to induce reliance, and Plaintiff saw, read, and reasonably did rely on them when purchasing Defendant's Products. Defendant's misrepresentations were a substantial factor in Plaintiff's decision to purchase the Products.

162.   Class-wide reliance can be inferred because Defendant's misrepresentations were material, i.e., a reasonable consumer would consider them important in deciding whether to buy the Products.

163.   Plaintiff and Class Members were injured as a direct and proximate result of Defendant's conduct because (a) they would not have purchased the Products if they had known the truth, (b) they overpaid for the Products because the

Products were sold at a price premium due to the misrepresentation, and/or (c) they did not receive the discounts they were promised, and instead received Products with market values lower than the promised market values.

164.    Defendant's acts or omissions are further injurious to the public interest because these practices were committed in the course of its business and have been committed repeatedly, both before and after Plaintiff purchased the Products. They are part of a pattern of false, misleading, and unfair advertising practices. These actions have injured other persons and, if continued, have the capacity to injure yet more persons.

165.    Plaintiff seeks damages and, alternatively, disgorgement and restitution to Plaintiff and the proposed Class of all Defendant's revenues wrongfully obtained from them as a result of Defendant's unfair competition, or such portion of those revenues as the Court may find equitable. Plaintiff is permitted to seek equitable remedies in the alternative because he has no adequate remedy at law. A legal remedy is not adequate if it is less certain than an equitable remedy. The elements of Plaintiff's equitable claims are different than and do not require the same showings as Plaintiff's legal claims. For example, to obtain damages under the CLRA, a plaintiff must show that they complied with the CLRA's notice requirement to obtain damages. No such requirements exist to obtain restitution. Because a plaintiff must make this additional showing to obtain damages, unlike for restitution, the legal remedies are more uncertain.

166.    Plaintiff also seeks an injunction. Legal remedies are inadequate because they would not prevent Defendant from continuing to engage in the unfair and deceptive practices described above. Plaintiff and Class Members face an imminent threat of future harm. Plaintiff would consider purchasing Products from Defendant again in the future if they could reasonably believe that Defendant's Reference Prices accurately reflect its regular and former prices, and that the market value of its Products and discounts were truthful. Without an injunction,

Plaintiff and Class Members have no realistic way to know which—if any—of Defendant's Reference Prices, discounts, and sales are not false or deceptive. Accordingly, Plaintiff and Class Members are unable to rely on Defendant's advertising in the future, and so cannot purchase the Products they would otherwise consider purchasing from Defendant in the future.

167.   Finally, the remedies at law available to Plaintiff and Class Members are not equally prompt or otherwise efficient. The need to schedule a jury trial may result in delay, and a jury trial would take longer and be more costly than a bench trial.

///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///
///

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays for judgment as follows:

A.    For an Order:

    a.  Certifying the Class;

    b.  Appointing Plaintiff as representative of the Class;

    c.  Appointing Plaintiff's counsel as Class Counsel;

B.    For actual damages, treble damages, and punitive damages where applicable, and according to proof at trial;

C.    For restitution and disgorgement of all profits and unjust enrichment, and other just equitable relief;

D.    For statutory and civil penalties and special damages where applicable, and according to proof at trial;

E.    For pre- and post-judgment interest on monetary damages;

F.    For preliminary and permanent injunctive relief;

G.    For reasonable attorneys' fees and costs and expert fees and costs as allowed by law; and

H.    For such other relief as this Court deems just and proper.

Dated:    November 26, 2024

Respectfully submitted,
**KING & SIEGEL LLP**

By: _____
Brent Boos, Esq.
Elliot Siegel, Esq.
Attorneys for Plaintiff and
the Putative Class

CLASS ACTION COMPLAINT